**UNITED STATES BANKRUPTCY COURT**
**NORTHERN DISTRICT OF ILLINOIS**
**EASTERN DIVISION**

| | | |
|---|---|---|
| IN RE: | ) | Bankruptcy No. 26 B 04816 |
| | ) | |
| NDG NEW DATING GAME, INC., | ) | Chapter 11 |
| | ) | |
| Debtor. | ) | Honorable Daniel R. Fine |

# MEMORANDUM OPINION GRANTING IN REM STAY RELIEF

Wilmington Savings Fund Society, FSB ("Wilmington") seeks in rem stay relief under 11 U.S.C. § 362(d)(4). That provision fences off property from the Bankruptcy Code's automatic stay for two years—no matter who files for bankruptcy. Wilmington asks the Court to cordon off property that it and its predecessor-in-interest have been attempting to foreclose on for more than four years. Debtor NDG New Dating Game, Inc., is the property's owner of record. But Debtor's principal corporate officer (and sole shareholder) sometimes claims the property as her own.

Enduring stay relief under Section 362(d)(4) is appropriate here. Debtor and its principal have stymied foreclosure rights through selective claims of ownership, at least one surreptitious transfer (for dubious value), and multiple eve-of-judicial-sale bankruptcies. Debtor articulates no legitimate purpose for its actions. Two prior bankruptcies involving the property went nowhere fast. The current case is tottering and unlikely to reach confirmation. The actions taken with respect to the property constitute a scheme to delay, hinder, or defraud that triggers Section 362(d)(4)'s protections.

Wilmington's motion is granted on the terms set out in this Opinion.

## I. Factual Background

The material facts are undisputed. Or at least unrebutted. In January 2021, Wilmington's predecessor-in-interest made a $192,500.00 commercial loan to Debtor.[1] (Dkt. No. 60, Ex. 1.) In exchange, Debtor signed a promissory note and mortgaged real property located at 1223 West 98th Street, Chicago, Illinois 60643 (the "Property"). (*Id.*) Debtor is the record titleholder of the Property. (*Id.*) Carol Richardson—Debtor's president, secretary, and sole shareholder—personally guaranteed the loan. (*Id.*; *see also* Dkt. No. 30 (identifying Richardson as Debtor's sole shareholder).)

In March 2022, Wilmington's predecessor filed a mortgage foreclosure complaint against Debtor and Richardson in Illinois state court. (Dkt. No. 60, Ex. 1.) The court issued a judgment of foreclosure and sale in October 2023; the judgment imposed $317,084.15 in liability on Debtor and Richardson and authorized a judicial sale to satisfy the judgment. (*Id.* at Ex. 2.) The sale was scheduled for November 20, 2023. (*Id.* at Ex. 3.)

Then came the first of several curveballs. Less than two weeks before the judicial sale was scheduled, Debtor executed a quitclaim deed—signed by Richardson—that transferred the Property to Richardson for the bargain-basement price of $1.00. (*Id.* at Ex. 4.) Debtor does not dispute that Wilmington's predecessor lacked knowledge of the transfer of the Property, which violated the loan documents. (*E.g., id.* at Ex. 7.)

As counsel for Debtor would later acknowledge at oral argument, the quitclaim

---

[1] Wilmington is the trustee of the TRK 2021-INV2 Trust and brings its motion solely in that capacity. *See* FED. R. CIV. P. 17(a)(1)(E) made applicable by FED. R. BANKR. P. 7017. The Court refers to the two predecessor entities simply as "Wilmington's predecessor." They are Patch of Land Lending, LLC, which made the original loan, and its successor, Toorak Capital Partners, LLC. (*See* Dkt. No. 60, Ex. 1.)

deed was never recorded. Debtor does not identify any legitimate business purpose for the transaction. Debtor's counsel advised the Court at oral argument: "[T]hat document [the quitclaim deed], and whoever prepared it, and why it was prepared, I have no knowledge of. I do know that it was never recorded. . . ." (Dkt. No. 76 at 10.)

On November 17, 2023, three days before that first scheduled sale, Richardson filed a Chapter 13 bankruptcy petition. (Case No. 23 B 15548, Dkt. No. 1.) Wilmington's predecessor initially pressed forward with the sale as scheduled. But after the sale took place, Richardson's bankruptcy attorney told Wilmington's predecessor about the quitclaim deed and demanded that the sale be canceled. (Dkt. No. 60, Ex. 7.) In January 2024, Wilmington's predecessor obtained an order to unwind the sale. (*Id.* at Ex. 8.)

About two months after that, Richardson's Chapter 13 bankruptcy case was dismissed for unreasonable delay. (*Id.* at Ex. 9.) The Chapter 13 Trustee had filed a motion seeking dismissal because Richardson did not provide scads of required documents, missed a scheduled Section 341 meeting, and did not timely begin making payments after filing her plan. (Case No. 23 B 15548, Dkt. No. 23.) After that first bankruptcy case was dismissed, state-court foreclosure litigation resumed. In June 2025, judgment was (again) entered against Debtor and Richardson. (*Id.* at Ex. 10.) A second sale was scheduled for August 14, 2025. (*Id.* at Ex. 11.) It never happened.

The day before the sale, Richardson filed her second Chapter 13 bankruptcy petition. (Case No. 25 B 12412, Dkt. No. 1.) Richardson again claimed to own the Property, and so the judicial sale screeched to a halt. Before the year was out, the second bankruptcy case was dismissed, this time for failing to make plan payments. (Dkt. No. 60, Ex. 12.)

The sale of the Property was then (for a third time) rescheduled. The sale was set

for March 19, 2026. (*Id.* at Ex. 13.) Shortly before that date, Wilmington's predecessor assigned its interest in the loan documents to Wilmington. (Dkt. No. 60, Keenan Decl. ¶¶ 5–6.) The third attempt at a judicial sale was not the charm; another bankruptcy petition kiboshed it. This time the petition was filed by Debtor.

On March 18, 2026, the day before the third attempted judicial sale of the Property, Debtor filed a Chapter 11 bankruptcy petition, opening the current case. (Dkt. No. 1.) Richardson signed the petition as Debtor's authorized representative. (*Id.* at 4.) Debtor now claims that it (not Richardson) owns the Property. (Dkt. No. 15.) Debtor does so, however, without identifying any written transfer of the Property from Richardson back to it.

Wilmington now seeks stay relief under Section 362(d)(4). Wilmington's motion details the transactions, attempted foreclosure sales, and bankruptcies outlined above. Wilmington argues that Debtor and Richardson have engaged in a scheme to delay, hinder, or defraud creditors—using bankruptcy not to reorganize but as a tool to bog down foreclosure proceedings. (*See generally* Dkt. No. 60.)

Debtor's written response to Wilmington's motion consumes just three pages. (Dkt. No. 69.) In it, Debtor confesses only to "having vigorously defended its interest in the state foreclosure proceeding" and denies having "entered into a scheme to delay, hinder[,] or defraud" Wilmington. (*Id*. at 1.) These conclusory assertions are the entirety of what Debtor writes in response to Wilmington's detailed factual allegations and fleshed-out legal arguments.

If fine words butter no parsnips, then conclusory statements make them inedible. The omission of anything like reasoned argument from Debtor's response—to say

nothing of evidence—is particularly noteworthy because this Court made plain that Wilmington's motion was a "put up or shut up moment," *cf. Weaver v. Champion Petfoods USA Inc.*, 3 F.4th 927, 938 (7th Cir. 2021) (discussing summary judgment), for purposes of stay relief. "If stay relief is opposed," the Court warned when setting a briefing schedule, "Debtor's response must marshal evidentiary support[.]" (Dkt. No. 66.)

The bulk of Debtor's short response attempts to make the case that Wilmington would be better off under Debtor's Chapter 11 plan than with stay relief. (Dkt. No. 69, 2–3.) Debtor touts two comparative market analyses it obtained from real estate brokers (not appraisers), which looked at a (very) small number of recent sales and simply reported sale prices. (*See id.*, Ex. B (identifying two sales and providing no opinions or analyses), Ex. C (identifying three different sales over a six-month period and offering no opinion as to the value of the Property, whether in foreclosure or otherwise)).

The analyses lead Debtor to surmise that Wilmington would be worse off in a foreclosure sale than under Debtor's proposed plan. Under that plan, Debtor proposes to make interest-only payments to Wilmington for up to two years, with a goal of refinancing the Property during that time, allowing Debtor to cash out Wilmington through a $275,000 payment. (*Id.* at 2, Exs. A & B; *see also* Dkt. No. 53.)[2]

The Court heard oral argument on Wilmington's motion on September 1, 2026. It then took Wilmington's motion under advisement.

---

[2] Debtor's response also takes aim at certain aspects of the underlying claim filed by Wilmington. (Dkt. No. 69, 3.) But Debtor does not explain how that argument speaks to the issues before the Court. Debtor's claim "objection" is contained only in a response brief, and so it is not properly before the Court in any event. *See* Local Rule 3007-1.

## II. Jurisdiction

Stay relief motions are "core" proceedings "arising under" the Bankruptcy Code; the Court has statutory authority to exercise jurisdiction and constitutional authority to decide Wilmington's motion. *See In re Ludkowski*, 587 B.R. 330, 335 (Bankr. N.D. Ill. 2018).

## III. Legal Standards

The Bankruptcy Code's automatic stay halts several types of activities, including state-law foreclosure suits. *See* 11 U.S.C. § 362(a). The stay "functions as one of the fundamental protections afforded to debtors by the bankruptcy laws. . . ." *In re Grede Foundries, Inc.*, 651 F.3d 786, 790 (7th Cir. 2011) (quotation marks and citation omitted). Fundamental, but not necessarily forever: "The automatic stay freezes things until the court can decide whether cause exists to lift the stay, or . . . there is some purpose under the Bankruptcy Code that will be served by keeping the stay in place." *In re Horton*, 595 B.R. 1, 2 (Bankr. D.D.C. 2019).

Relief from the stay may be appropriate in one or more of the circumstances described by 11 U.S.C. § 362(d). As pertinent here, Section 362(d)(4) directs courts to provide stay relief—

> with respect to a stay of an act against real property . . . by a creditor whose claim is secured by an interest in such real property, if the court finds that the filing of the petition was part of a scheme to delay, hinder, or defraud creditors that involved either—
>
> > (A) transfer of all or part ownership of, or other interest in, such real property without the consent of the secured creditor or court approval; or
> >
> > (B) multiple bankruptcy filings affecting such real property.

11 U.S.C. § 362(d)(4).

If a stay-relief order issued under Section 362(d)(4) is recorded in compliance with state law, the order becomes "binding in any other [bankruptcy] case" filed within 2 years of the date of the order. *Id.* (providing that a debtor in a subsequent case may seek relief "based upon changed circumstances or for good cause shown")*; see also In re Wallace*, 676 B.R. 298, 307–08 (Bankr. S.D.N.Y. 2026). This form of relief is known as in rem stay relief. *In re Montalvo*, 416 B.R. 381, 386 (Bankr. E.D.N.Y. 2009).

One moving for in rem stay relief must prove: (1) that the debtor engaged in a scheme to delay, hinder, or defraud; and (2) that the scheme involved either multiple bankruptcy filings or transferring the property without secured-creditor consent or court approval. *Palladino v. HSBC Bank USA, N.A.*, 502 F. Supp. 3d 1336, 1341 (N.D. Ill. 2020) (citing *In re Briggs*, No. 12 B 14853, 2012 WL 3780542, *4 (Bankr. N.D. Ill. Aug. 31, 2012)).

The term "scheme" comes freighted with legal meaning. A scheme is "a plan or course of action formed with the intention" to accomplish an objective. *In re Karpuleon*, No. 24-80647, 2024 WL 5011412, *5 (Bankr. C.D. Ill. Dec. 6, 2024). Thus, a scheme within the meaning of Section 362(d)(4) "require[s] intentional" but "not necessarily artful plans" to delay, hinder, or defraud creditors. *Id.*; *see also Wallace*, 676 B.R. at 307–08; *In re Anderson*, 594 B.R. 509, 515 (Bankr. D. Me. 2018).

To the extent the case law reflects some judicial handwringing over what exactly makes for a "scheme"—some courts suggest a plan must amount to "an intentional *artful* plot," *e.g.*, *Palladino*, 502 F. Supp. 3d at 1341 (emphasis added)—the fine-grained distinctions seem largely semantical. This is because courts rarely see direct evidence of a scheme to hinder, delay, or defraud. Courts generally must extrapolate from the facts. *Briggs*, 2012 WL 3780542, at *5.

Courts undertake that exercise by examining the facts and referencing case-law guideposts. Surveying the case law in this realm throws into sharp relief the quintessentially judicial exercise of comparing cases, identifying similarities, and reasoning through differences. *E.g.*, Ronald Dworkin, *Law's Empire* 229–32 (1986). That process helps judges determine whether in rem stay relief is appropriate on a given set of facts. And so: decisions that consider relief under Section 362(d)(4) do not appear to turn on lexicological hairsplitting over whether a plan qualifies as "artful" or simply "intentional." Courts instead look at actions taken with respect to a given property and simply ask whether the facts are "enough" to merit in rem stay relief.

Determining whether a debtor's pre-bankruptcy activities go beyond legitimate pre-bankruptcy planning efforts and cross into impermissible scheme territory, *cf. In re Wiggains*, 848 F.3d 655, 664 (5th Cir. 2017), demands a holistic, fact-specific assessment. Indications of a scheme include: (1) multiple bankruptcy cases ending in quick dismissals; (2) unchanged circumstances between repeated cases; (3) "tag-team" serial bankruptcy filings by co-debtors; (4) strategically timed petitions that thwart creditor remedies; (5) a debtor's inability to fund a plan; and (6) a debtor's failure to make mortgage payments for an extended period of time. *See In re House*, No. 17-30434-BEH, 2018 WL 1505572, at *5 (Bankr. E.D. Wis. Mar. 26, 2018) (collecting authority); *In re Garcia,* No. 22 B 130, 2022 WL 665825, at *5 (Bankr. N.D. Ill. Mar. 7, 2022).

## IV. Discussion

### A. Debtor Is Not Entitled to An Evidentiary Hearing.

Before reaching the merits, there is a lurking procedural issue that needs attention. At oral argument, counsel for Debtor asked the Court to decide Wilmington's motion

only after holding an evidentiary hearing. Debtor is not entitled to one.

Motions seeking relief from the automatic stay are intended to be "summary in character." *In re Vitreous Steel Prods. Co.*, 911 F.2d 1223, 1232 (7th Cir. 1990); *see also In re Smith*, 675 B.R. 878, 891 (Bankr. N.D. Ill. 2025). A full-blown evidentiary hearing on a stay-relief motion is therefore not a given. *E.g., Garcia*, 2022 WL 665825, at *7 n.7 (evidentiary hearing not required where undisputed facts established right to in rem stay relief). Courts appropriately withhold evidentiary hearings from parties who cannot "show that an evidentiary hearing would have an articulable bearing on the material issues in dispute." *Sullivan v. Running Waters Irrigation, Inc.*, 739 F.3d 354, 359 (7th Cir. 2014); *see also In re Bartle*, 560 F.3d 724, 729 (7th Cir. 2009) ("The parties are entitled to an opportunity to be heard, not to a particular type of hearing."). Applying these teachings supports the conclusion that an evidentiary hearing is unnecessary.

When the Court asked Debtor's counsel what purpose an evidentiary hearing would serve here, counsel responded that an evidentiary hearing would address why Richardson signed the quitclaim deed in favor of herself. Debtor does not dispute the authenticity of the quitclaim deed, but Debtor's counsel speculated that—just maybe—Richardson merely implemented guidance from her previously retained bankruptcy counsel when she signed the quitclaim deed that took the Property off Debtor's balance sheet and put it onto hers. Counsel expressed his *belief* that Richardson "did not understand or recognize that the [P]roperty was not in her individual name, but in the name of an LLC [sic]." (Dkt. No. 76 at 12–13.)

That explanation is unconvincing for at least three reasons. First, the belief Debtor's counsel expressed is incompatible with his forthright acknowledgment that

counsel was "not aware of" and had "no knowledge of" what "advice was provided by previous attorneys." (*Id.* at 9–10.) Unsupported attorney statements are not evidence. *Lee v. Chi. Youth Ctrs.*, 69 F. Supp. 3d 885, 888 (N.D. Ill. 2014). The same self-evidently holds true for attorney speculation about potential answers to unasked questions. Such speculation falls far short of *showing* that an evidentiary hearing would bear "on the material issues in dispute." *Sullivan*, 739 F.3d at 359. And Debtor does not contend that it somehow lacked access to Richardson—who could easily have provided a declaration (under penalty of perjury) to add any exculpating context.

Debtor thus has not shown that "the briefing process was insufficient to present or rebut material facts such that an evidentiary hearing was necessary to adequately resolve this motion." *Id.* An argument that amounts to "I did not gather and present evidence within my control and am therefore entitled to an evidentiary hearing" hardly justifies expending additional judicial and litigant resources. This is particularly true where, as already noted, this Court specifically alerted Debtor that, if it opposed stay relief, it would be required to come forward with evidence. (Dkt. No. 66.)

Second, even if Richardson had been acting on advice of a previous attorney when she executed a quitclaim deed by Debtor in favor of herself—again, Debtor has presented zero evidence of this—it would not move the analytical needle. Section 362(d)(4) applies to property that "was part of a scheme delay, hinder, or defraud creditors that involved either— (A) transfer of all or part ownership of . . . such real property without the consent of the secured creditor or court approval; or (B) multiple bankruptcy filings affecting such real property." The statute is written in the passive voice, and its plain language suggests agnosticism about *who* specifically cooked up a scheme:

> [I]t sometimes appears that the scheme may have been perpetrated by an unscrupulous lawyer, bankruptcy petition preparer, or unauthorized legal practitioner. . . . [But] the language of section 362(d)(4) does not require a court to determine precisely *who* is responsible for perpetrating the scheme . . . .

*See Greenstein v. Wells Fargo Bank, N.A. (In re Greenstein)*, 576 B.R. 139, 163 (Bankr. C.D. Cal. 2017). In fact, Section 362(d)(4) "does not require that it be the debtor who has created the scheme or carried it out, or even that the debtor be a party to the scheme at all." *In re Duncan & Forbes Dev., Inc.*, 368 B.R. 27, 32 (Bankr. C.D. Cal. 2006).

Third, clients are "accountable for the acts and omissions of their attorneys." *Pioneer Inv. Servs. Co. v. Brunswick Assocs. Ltd. P'ship*, 507 U.S. 380, 396 (1993); *see also In re Sterling*, 933 F.3d 828, 833 (7th Cir. 2019); *Choice Hotels Int'l, Inc. v. Grover*, 792 F.3d 753, 754 (7th Cir. 2015). In other words, even if Richardson received "bad legal advice," it would "not relieve [her] of the consequences of her own acts." *Cannon-Stokes v. Potter*, 453 F.3d 446, 449 (7th Cir. 2006).

Perhaps good-faith reliance on legal advice could suggest that there simply was no plan to delay, hinder, or defraud (and thus no scheme). *See Wells Fargo Bank NA v. Dilworth*, No. 14-CV-375-JPS, 2014 WL 5305904, *7 (E.D. Wis. Oct. 15, 2014) (upholding a bankruptcy judge's ruling that stay relief was not appropriate, based in part on advice of counsel, but noting that "[a]nother bankruptcy judge reviewing the case may have decided it in precisely the opposite way"). Given the total absence of actual evidence, however, the Court will not tease out that argument on Debtor's behalf.

For these reasons, the Court concludes that Debtor is not entitled to an evidentiary hearing.

**B. In Rem Stay Relief Is Appropriate.**

A party moving for in rem stay relief has the burden of establishing its entitlement to it. *Karpuleon*, 2024 WL 5011412, at *8; *House*, 2018 WL 1505572, at *5. If a moving party proves its prima facie case, the burden of persuasion shifts to the debtor. *Garcia,* 2022 WL 665825, at *5. As already noted, Debtor has not put forward evidence (or even reasoned argument) on matters that bear on the propriety of in rem stay relief. Wilmington's motion therefore comes down to its prima facie case.

Wilmington has carried its burden. The Court finds that Debtor filed this bankruptcy case as part of a scheme to delay or hinder Wilmington and its predecessor. That scheme involved multiple filings by Richardson and Debtor on the eve of scheduled foreclosure sales. Richardson's first Chapter 13 case came just three days before the first scheduled foreclosure sale. Her second Chapter 13 petition was filed one day before the second foreclosure sale. This Chapter 11 case by Debtor was likewise filed just one day before a third scheduled foreclosure sale.

Courts may "infer an intent to hinder, delay, and defraud creditors from the fact of serial filings alone." *In re Blair*, No. 09-76150, 2009 WL 5203738, at *4 (Bankr. E.D.N.Y. Dec. 21, 2009); *see also Behrens v. U.S. Bank Nat'l Ass'n (In re Behrens)*, 501 B.R. 351, 356 (B.A.P. 8th Cir. 2013) (affirming in rem relief where debtor did not deny that bankruptcy filings were an attempt to stop foreclosure), *aff'd,* 566 F. App'x 547 (8th Cir. 2014); *In re Lee,* 467 B.R. 906, 920–21 (B.A.P. 6th Cir. 2012) (affirming court's award of in rem relief where debtor was a serial filer and continued to thwart foreclosure proceedings); *In re Magnale Farms, LLC,* No. 17-61344, 2018 WL 1664849, at *6 (Bankr. N.D.N.Y. Apr. 3, 2018) (stating that a court may "draw a permissible inference of a scheme to hinder, delay, and

defraud based on the mere timing and filing of several bankruptcy cases"); *In re Hymes*, No. A12-00599-GS, 2013 WL 653060, at *5 (Bankr. D. Alaska Feb. 20, 2013) ("Courts have consistently recognized that repeated bankruptcy filings made on the eve of successive foreclosure attempts constitute strong evidence of an intent to delay and hinder secured creditors from collection."). The carefully timed filings militate in favor of stay relief here.

The Court is mindful that some courts have held that three eve-of-foreclosure-sale bankruptcy petitions do not necessarily constitute a scheme within the contemplation of Section 362(d)(4), at least not without more. *See In re Mendiola*, 573 B.R. 758, 764 (Bankr. E.D. Wis. 2017) ("A court should not presume that a debtor is acting in bad faith or that a second or even a third successive filing is necessarily part of a 'scheme.'"). There is no need to stake out a purely numbers-based position here, however, because additional considerations in this case suggest that a scheme to delay, hinder, or defraud Wilmington and its predecessor have tied up the Property.

The bankruptcy cases Richardson filed went nowhere fast. Her first case was dismissed for unreasonable delay and lasted four months. During that case, she filed a statement of monthly income documenting that she made $0.00 per month. (Case No. 23 B 15548, Dkt. No. 14.) Her second case was dismissed for failure to make plan payments; that case also lasted just four months. "Strategically timing a bankruptcy to stay or cancel foreclosure proceedings can be a legitimate tactic," but "it evokes bad faith" when filed "without the ability or intention to reorganize." *In re Olayer*, 577 B.R. 464, 469 (Bankr. W.D. Pa. 2017) (internal citation omitted). That Richardson twice filed for bankruptcy and lacked the intention or ability to fund a plan is evidence of a scheme to delay, hinder, or defraud Wilmington and its predecessor.

The current Chapter 11 case filed by Debtor has survived slightly longer than either of Richardson's Chapter 13 cases (nearly seven months and counting), but the case has never marched at even a king's pace, and its reorganization prospects appear bleak. Debtor failed to timely file a plan which provoked a motion to dismiss from the United States Trustee. (Dkt. No. 47.) Debtor ultimately filed a plan, but only after missing the deadline to timely seek an extension to the exclusivity period. (Dkt. No. 63.) And since the case's inception, Debtor has always had less than $8,000 on hand (generally far less, and sometimes $0.00). (*E.g.,* Dkt. Nos. 42–45, 65, 74.) Because Debtor lacks any reliable monthly income stream, it would likely be unable to repair or maintain the Property in the ordinary course, much less in the face of any unexpected or big-ticket expenses. (*See id.*)

Further, Debtor's plan likely cannot be confirmed given that (1) Wilmington holds the largest secured claim, (2) Wilmington holds the largest unsecured claim, (3) Wilmington stated in open court that it will oppose Debtor's plan, and (4) Debtor's expressed desire to refinance in the future does not come with any reason to suppose that refinancing the mortgage securing the Property would be practicable. *E.g.*, *In re M & C P'ship, LLC,* No. 19-11529, 2021 WL 12102059, *10 (Bankr. E.D. La. Mar. 15, 2021) (plan not feasible where it did not project what the property would be worth when balloon payment would come due, and it was speculative whether third-party refinancing could be obtained to fund the balloon payment); *In re Geijsel*, 480 B.R. 238, 261 (Bankr. N.D. Tex. 2012) (denying confirmation where a debtor's plan to refinance was speculative).

In short, this case appears to be an "impecunious single asset real estate project" that Debtor is attempting to keep "alive on an interest-only basis" supported only by the

"hope that [in 2 years] . . . some economic salvation will have occurred which will allow a sale or refinancing of the property." *In re Delray Assocs. Ltd. P'ship*, 212 B.R. 511, 516 (Bankr. D. Md. 1997).

The history of bankruptcies—two that lacked prospects and quickly failed, plus a third seemingly headed in the same direction—would be enough to support stay relief under Section 362(d)(4) given the repeated foreclosure sales that the bankruptcies stopped or unwound. And yet there is more.

The transfer of the Property from Debtor to Richardson in November 2023 and the possible transfer of the Property back to Debtor strongly indicate that "[s]omething is rotten in the state of Denmark." *Cf. United States v. Alexander*, 110 F. Supp. 2d 762, 767 n.8 (S.D. Ill. 2000) (quoting William Shakespeare, *Hamlet*, act 1 sc. 4)). In the period covered by Wilmington's motion, the Property started out in the hands of Debtor, secured by a mortgage. The mortgage documents prohibited transfers to others without lender consent. Despite this, Debtor (through Richardson) surreptitiously transferred the Property to Richardson in November 2023 by way of a quitclaim deed. The sale price was just $1.00. What possible business sense did the conveyance make for Debtor—shedding an asset that on Richardson's reckoning was worth about $200,000.00 (Case No. 23 B 15548, Dkt. No. 11 at 1) while retaining liability under the mortgage and note? Debtor offers no explanation.

Further, Debtor now takes the position that it (still? again?) owns the Property. How exactly (and whether) the Property has made its way back onto Debtor's books is far from clear. During oral argument on this motion, Debtor's counsel suggested that Debtor has *always* owned the Property simply because the transfer to Richardson in

November 2023 was never recorded. (Dkt. No. 76 at 9, 10.) Those suggestions were faulty. A properly executed quitclaim deed is valid in Illinois. *Schechter v. Weiler (In re Blair)*, 330 B.R. 206, 211–12 (Bankr. N.D. Ill. 2005). Failing to record a quitclaim deed may void it as against a good-faith purchaser for value who lacks notice, *see* 765 ILCS 5/30, but no one suggests anything like that here.

If there was in fact no written transfer back to Debtor, it may be that Richardson still owns the Property as a matter of black letter law. *See Logue v. Von Almen*, 40 N.E.2d 73, 81 (Ill. 1941) ("A void deed passes no title and can not be made the foundation of a good title even under the application of the equitable doctrine that protects bona fide purchasers."); *City of Virginia v. Mitchell*, 991 N.E.2d 936, 942 (Ill. App. Ct. 2013) (discussing minimum written requirements to transfer property under Illinois Conveyances Act). If that is the case, then Debtor—literally and in every sense—has no business attempting to put forward a plan in this single asset real estate case.

If nothing else, Debtor's seeming inattention to the foundational question of whether it even owns the Property has little to commend it and further supports an approach to stay relief that treats the Property and not the identity of the debtor as the appropriate unit of measure. Doing so may allow thrice-thwarted state proceedings to reach their conclusion; on these facts, it is a worthy aim. "[B]ankruptcy courts must . . . giv[e] full respect to the panoply of interests to be weighed and protected in these matters, as well as to the dignity and power of other judicial processes." *In re Merriman*, 616 B.R. 381, 394 (9th Cir. B.A.P. 2020).

The record strongly supports the inference that Debtor and Richardson have been engaging in a game of bankruptcy-foreclosure keep-away. Tagging the Property with in

rem stay relief under Section 362(d)(4) is an appropriate way to bring the game to an end.

## V. Conclusion

For the foregoing reasons, Wilmington's motion for in rem stay relief under Section 362(d)(4) is GRANTED. The Court's grant of stay relief takes effect immediately, eliminating the 14-day pause on relief that would otherwise apply. *See* FED. R. BANKR. P. 4001(a)(4). Based on this disposition, the Court need not take up Wilmington's separate request for less-enduring stay relief under Section 362(d)(1).

The Court will enter a separate order on the docket consistent with the foregoing.

**ENTERED:**

**DATE: October 9, 2026**

**Daniel R. Fine**
**United States Bankruptcy Judge**